Becker v. State



COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS





BILLY ODELL HENRY,


 Appellant,


v.


THE STATE OF TEXAS,


 Appellee. 

§


 


§


 


§


 


§


 


§



§

No. 08-05-00364-CR



Appeal from


 292nd District Court


of Dallas County, Texas


(TC # F-0458774-KV)




O P I N I O N



 Billy Odell Henry appeals his conviction of aggravated sexual assault of a child, enhanced
by two prior felony convictions. After Appellant entered a plea of guilty before the jury, the trial
court conducted a unitary proceeding, rather than a bifurcated trial. Tex.Code Crim.Proc.Ann. art.
26.14 (Vernon 1989); see Frame v. State, 615 S.W.2d 766, 767 (Tex.Crim.App. 1981). The jury
found Appellant guilty, found the enhancement paragraphs true, and assessed his punishment at
imprisonment for a term of seventy-five years. We affirm.

FACTUAL SUMMARY


 In 2003, the complainant, M.C., lived with her mother, Jamie, her younger brother and sister,
and her mother's boyfriend, Appellant. (1) M.C.'s biological father had been killed before she was
born and Jamie began dating Appellant when M.C. was five years old. M.C. described her
relationship with Appellant as good and said that he was "like a regular father." Jamie learned in
1998, approximately four years after she and Appellant began dating, that she was HIV positive. 
Appellant was aware of Jamie's HIV status, and despite the risks, he and Jamie engaged in
unprotected sex. Appellant first tested positive for HIV in June of 2003. 

 Prior to learning his HIV status, Appellant told M.C. on March 3, 2003 that he would take
her to get her ears pierced for her thirteenth birthday. They stopped at a liquor store and Appellant
purchased beer for himself and wine coolers for her. Appellant told M.C. that he was taking her to
"chill" with his "homeboys" but he stopped at a motel instead. He told M.C. that he would take her
to get her ears pierced after they watched television in the room. Appellant gave M.C. the wine
coolers and they watched television for a while. He would not let M.C. call her mother because it
would seem strange if she called her mother from a motel. Appellant then told M.C. to take off her
clothes. Shocked at what Appellant had said, M.C. initially refused. He then told her that he was
her daddy and she had to obey him. M.C. took off her clothes and Appellant sexually assaulted her. 
Appellant wore a condom during the assault. After the assault, M.C. took a shower because she felt
dirty. She dressed and waited in the car while Appellant showered. When Appellant got in the car,
he told M.C. that it would break her mother's heart if she found out what they had done and she
should act like nothing had happened. Appellant then took M.C. to get her ears pierced and to her
cousin's house to celebrate her birthday. M.C. was afraid to tell anyone what Appellant had done
to her because she was afraid something bad would happen and she did not want to hurt her mother. 
Appellant sexually assaulted M.C. on four other occasions but he eventually stopped after M.C.
refused. 

 The following school year, M.C. asked her mother if she could move to Corsicana and live
with her godmother. Jamie agreed and M.C. began living in Corsicana and attending school there. 
Shortly thereafter, M.C. told her godmother about the abuse but she was still afraid to talk to her
mother about it. M.C.'s godmother reported the abuse to the police and Appellant was arrested. 
Jamie and Appellant continued to talk and correspond by letter while he was in jail. Appellant
pressured her to make M.C. recant her allegations. In one of the letters, Appellant warned Jamie that
she would lose her freedom and the children if the case against him was not dropped. Jamie
eventually stopped communicating with Appellant. 

 Appellant testified at trial and admitted engaging in sex with M.C. on the five occasions
testified to by M.C. According to him, however, it was M.C.'s idea to go to a motel room and he
did not force her to have sex with him. He acknowledged that it was wrong and it should not have
happened. On the subsequent occasions, he did not force her to have sex with him because they had
discussed it beforehand each time. Appellant did not agree that the sexual assaults ended because
M.C. refused but said he stopped because he did not want to have to discuss it with M.C. any longer. 
Appellant agreed that he had written several letters asking Jamie to make M.C. recant her
accusations. However, it was Jamie's idea that Appellant could get out of jail if M.C. signed an
affidavit of non-prosecution. Appellant believed that he deserved the minimum twenty-five year
sentence because he had accepted responsibility and was sorry for what he had done. While
admitting that he was wrong, Appellant also accused Jamie and M.C. of lying during their testimony. 
FINAL ARGUMENT


 In Issue One, Appellant contends that the prosecutor improperly argued that Appellant had
manipulated the jury by pleading guilty. He maintains that the prosecutor penalized Appellant for
exercising his constitutional right to a jury trial and his statutory right to enter a plea of guilty before
the jury.

 In the opening portion of his closing argument, the prosecutor argued that the jury should
start at the top of the punishment range and work their way down if they found anything redeeming
in Appellant. The prosecutor urged that there was nothing redeeming in Appellant because he had
committed several horrible acts and then had tried to manipulate M.C., Jamie, and the jury. 
Addressing Appellant's claim that he had taken responsibility by pleading guilty, the prosecutor then
argued as follows:

 That is what he is about is manipulating everybody around him, everybody around
him. Sure, they're going to stand up and say, well, he pled guilty and he did the right
thing. Well, did he really take responsibility? Sure, he pled guilty and then he tried
to minimize everything he did. 


The prosecutor then outlined the evidence showing how Appellant had attempted to minimize what
he had done and had tried to manipulate the situation. For example, the prosecutor dismissed as
"ridiculous" Appellant's testimony that it was M.C.'s idea to go to a motel and engage in sex. 
Referring to letters written by Appellant to Jamie, the prosecutor pointed out that Appellant had
asked her to convince M.C. to recant her allegations. He warned her that CPS would take Jamie's
children if she did not help get him out of jail. 

 Defense counsel told the jury during final argument that Appellant pled guilty because he was
guilty and he had taken responsibility for his wrongdoing. Appellant understood he had a right to
a jury trial but he had chosen to plead guilty because he knew that he was guilty. Defense counsel
disputed the prosecutor's suggestion that Appellant's guilty plea was an attempt to manipulate the
system, and he asked the jury to consider that Appellant had taken responsibility for the offense and
"he should get credit for that."

 In rebuttal, the prosecutor made the argument complained of by Appellant on appeal:

 But [Appellant] blames all of his misdeeds, blames it on drugs. He blames this partly
on [M.C.]. Make no mistake about it, that is what he is doing. . . . It is time for him
to take responsibility. You know why he stood before you and pled guilty, because
you see the evidence, you see how strong it was. He had no choice. No choice. This
case was overwhelming against him. 


The trial court overruled Appellant's objection that the argument interfered with Appellant's
"absolute right to a jury trial," but the court instructed the jury that "[e]very person has a right to a
jury trial under the constitution of this state and nobody is obliged to come into court and plead
guilty if they choose not to do so." The prosecutor then urged the jury not to be fooled by the
argument that Appellant had taken responsibility by pleading guilty because it was "another
manipulation." 

 Proper jury argument includes four areas: (1) summation of the evidence presented at trial;
(2) reasonable deductions drawn from that evidence; (3) answers to opposing counsel's argument;
and (4) pleas for law enforcement. Wesbrook v. State, 29 S.W.3d 103, 115 (Tex.Crim.App. 2000). 
In reviewing final arguments, we must consider the remarks at issue in the context of the entire jury
argument rather than isolated sentences. Denison v. State, 651 S.W.2d 754, 761 (Tex.Crim.App.
1983). 

 The right to a jury trial is guaranteed under the Sixth and Fourteenth Amendments. A penalty
cannot be imposed for the exercise of a constitutional right. Villarreal v. State, 860 S.W.2d 647, 649
(Tex.App.--Waco 1993, no pet.), citing Spevack v. Klein, 385 U.S. 511, 515, 87 S.Ct. 625, 628, 17
L.Ed.2d 574 (1967). Citing Villarreal, Appellant argues that the prosecutor's argument was
improper because it penalized him for exercising his right to a jury trial. In Villarreal, the prosecutor
argued during the punishment phase of a sexual assault prosecution that the defendant did not rape
the child victim just once, but forced her to come into the courtroom "in front of a bunch of
strangers." Id. at 649. The court of appeals found the argument improper because it penalized the
defendant for exercising his constitutional rights to a jury trial and to confront his accusers. Id. Even
though the trial court had sustained an objection and had instructed the jury to disregard the
argument, the court of appeals found the argument reversible because the argument had equated the
witness' responsibility to testify with being subjected to rape a second time. Id. This argument was
so inflammatory that its prejudicial effect could not reasonably be removed from the minds of jurors
by the instruction to disregard. Id.

 The instant case does not involve the same type of improper and inflammatory argument. 
The prosecutor did not suggest that Appellant had done anything improper by pleading guilty nor
did he ask the jury to penalize Appellant for exercising his constitutional right to a jury trial or his
statutory right to plead guilty before the jury. Instead, his argument concerned what inferences could
be drawn from Appellant's plea of guilty. Defense counsel had urged during his argument that
Appellant had accepted responsibility by pleading guilty. The prosecutor countered this argument
by stating that Appellant had pled guilty because the evidence against him was overwhelming. He
then pointed to other evidence supporting an inference that Appellant had not really taken
responsibility for his crime. We overrule Issue One.

EVIDENTIARY ERROR?


 In Issue Two, Appellant contends that the trial court erred in permitting nurse Jackie Gregory
to testify regarding the risk of HIV transmission between sex partners who engage in "unprotected
sex" because she was not qualified as an expert to give her opinion on HIV transmission. (2) Gregory
is employed by the University of Texas Medical Branch as a family nurse practitioner at the Dallas
County Jail. She provides care for inmates with any type of infectious disease. Because Appellant
is HIV positive, he was referred immediately to her. Gregory has a master's degree in nursing,
extensive clinical training, and more than twenty years of experience as a nurse. She has also
received additional training related to her specialized position with the Dallas County Jail. Gregory
testified without objection that HIV is transmitted through contact with a body fluid containing blood
and it can be transmitted during unprotected sexual activity. When asked a hypothetical question
regarding what type of risk an HIV positive person posed to their partner during unprotected sex,
Appellant objected to Gregory's qualification to answer that question and took her on voir dire. Her
training in infectious diseases included a preceptorship at Amelia Court, which is the HIV clinic at
Parkland Hospital. She estimated that she had several hundred hours of classroom and clinical
training related to HIV. She had not conducted any studies or written any articles on the subject. 
The trial court overruled Appellant's objection to Gregory testifying "in this area as an expert." 
Gregory testified before the jury that multiple studies had indicated there is a high risk of HIV
transmission during unprotected sex.

 Rule 702 provides that if scientific, technical, or other specialized knowledge will assist the
trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert
by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion
or otherwise. Tex.R.Evid. 702. The special knowledge which qualifies a witness to give an expert
opinion may be derived from specialized education, practical experience, a study of technical works,
or a varying combination of these things. Wyatt v. State, 23 S.W.3d 18, 27 (Tex.Crim.App. 2000);
Penry v. State, 903 S.W.2d 715, 762 (Tex.Crim.App. 1995). We review a trial court's ruling on the
admissibility of evidence under the abuse of discretion standard. Willover v. State, 70 S.W.3d 841,
845 (Tex.Crim.App. 2002); Montgomery v. State, 810 S.W.2d 372 (Tex.Crim.App.1990)(opinion
on reh'g). This standard also applies to the trial court's decision whether an expert witness is
qualified to testify. Wyatt, 23 S.W.3d at 27. Absent a clear abuse of that discretion, the trial court's
decision to admit or exclude expert testimony will not be disturbed. Id.

 Assuming for purposes of resolving this issue that Gregory must be qualified as an expert in
order to testify regarding the risk of HIV transmission during unprotected sex, the State offered
testimony to establish that Gregory is qualified to testify about this matter. (3) Gregory, a nurse
practitioner who specializes in infectious diseases, has received extensive training and education
related to HIV and she indicated that she is familiar with several studies establishing that there is a
high risk of HIV transmission during unprotected sex. We find no abuse of discretion in the trial
court's decision to admit her testimony. We overrule Issue Two and affirm the judgment of the trial
court.

August 23, 2007 

 ANN CRAWFORD McCLURE, Justice


Before Chew, C.J., McClure, and Carr, JJ.


(Do Not Publish)
1. Appellant is the father of M.C.'s brother and sister. 
2. M.C. was unsure whether Appellant used a condom each time he sexually assaulted her. Appellant testified
that he used a condom "most every time" he had sex with M.C., but he admitted that he never used a condom when
engaging in sexual intercourse with other partners. He did not believe, however, that he had taken much of a chance in
exposing M.C. to HIV when he was having intercourse with her.
3. Among its arguments related to Issue Two, the State contends that it is well established and generally known
that there is a high risk of HIV transmission during unprotected sex, and therefore, it was not required to establish
Gregory's qualifications as an expert in order for her to testify regarding this scientific fact. The State cites Mathonican
v. State, 194 S.W.3d 59 (Tex.App.--Texarkana 2006, no pet.) in support of this argument. In Mathonican, the Texarkana
Court of Appeals considered whether the evidence was sufficient to prove that the HIV-positive defendant's seminal fluid
was a deadly weapon. Mathonican, 194 S.W.3d at 67-68. As part of its analysis, the court of appeals took judicial notice
of the "well-known fact that an infected individual may possibly transmit the HIV through unprotected sexual intercourse
with his or her partner." Id at 69-70. Citing numerous cases, the court of appeals observed that "courts have universally
recognized as judicially noticeable the fact that seminal fluid produced by an HIV-positive man during unprotected
intimate sexual contact can transmit the virus, risking the transmittee contracting AIDS." Id. at 69-70. The court held
that it was generally well-known and beyond reasonable debate that the seminal fluid of an HIV-positive man may
become a deadly weapon if he engages in unprotected sexual contact, and this "basic truth" need not be established at
trial by expert testimony. Id. at 69, citing Emerson v. State, 880 S.W.2d 759, 764-65 (Tex.Crim.App. 1994)(holding
that judicial notice of sufficiently established scientific facts may be taken even by appellate court). But see Hernandez
v. State, 116 S.W.3d 26, 29-30 (Tex.Crim.App. 2003)(holding that judicial notice of the reliability of a particular
methodology may be taken only after at least one trial court has conducted an adversarial Daubert/Kelly "gatekeeping"
hearing to determine the reliability of the given scientific theory and its methodology). While the Mathonican court
judicially noticed that HIV "may possibly" be transmitted during unprotected sex, it did not judicially notice the specific
scientific fact at issue here: whether there is a high risk of HIV transmission during unprotected sex. Because Appellant
did not object to the reliability or validity of the scientific theory related to HIV transmission and the degree of risk of
HIV transmission during unprotected sex, but simply objected to Nurse Gregory's qualifications to testify regarding the
degree of risk, we are not called upon to judicially notice any scientific facts related to HIV transmission. We therefore
leave open the question of whether it is appropriate to judicially notice these scientific facts.